589 So.2d 184 (1991)
Billy Ray CLARK and Halliburton Industrial Services Division
v.
CONTAINER CORPORATION OF AMERICA, INC.
1900325.
Supreme Court of Alabama.
September 27, 1991.
*185 Richard H. Taylor and Robert J. Hedge of Jackson & Taylor, P.C., Mobile, for appellants.
Carroll H. Sullivan of Clark, Scott & Sullivan, Mobile, for appellee.
Richard W. Vollmer III of Reams, Vollmer, Phillips, Killion, Brooks & Schell, P.C., Mobile, for intervenor.
Forrest S. Latta of Pierce, Carr & Alford, Mobile, for amicus curiae Alabama Defense Lawyers Ass'n.
Matthew C. McDonald of Miller, Hamilton, Snider & Odom, Mobile, for amicus curiae Alabama Civ. Justice Reform Committee.
HOUSTON, Justice.
The following question was certified to this Court by the United States District Court for the Southern District of Alabama:
"Is Alabama Code 1975, § 6-11-3, either on its face or as applied to the above-styled case, violative of Alabama Constitution of 1901, Article I, § 11; Article *186 I, § 13; Article I, § 6; or Article III, § 42?"
We assume that the phrasing of the question was intended as a guide and that it was not meant to restrict our consideration only to the constitutionality of Ala. Code 1975, § 6-11-3, but was intended to extend to all portions of Article I ("Structured Damages") of Chapter 11, of Title 6 (§§ 6-11-1 through 6-11-7).
Billy Ray Clark's claim arose out of an "injury done him in his ... person," while operating high pressure cleaning equipment for his employer, Halliburton Industrial Services Division ("Halliburton"). Halliburton had been engaged by Container Corporation of America, Inc. ("Container"), to perform industrial cleaning services at a Container facility. Clark was performing these services at the time he sustained his injury. The jury returned a verdict against Container in the amount of $822,600 in the United States District Court for the Southern District of Alabama, Southern Division. Of the total sum awarded, it is only the amount awarded for lost future wages ($289,800) that is in any way involved in this certified question,[1] because Container filed a post-trial motion requesting the court to structure the award of future damages in accordance with Ala.Code 1975, §§ 6-11-1 through 6-11-7, particularly § 6-11-3. The parties have stipulated as to the applicability of these statutes to this case. Clark, however, objected to the application of § 6-11-3 as violating four constitutional provisionsArticle I, §§ 6, 11, and 13, and Article III, § 42.
Alabama Code 1975, § 6-11-3, provides:
"Where the damages assessed against a defendant by the trier of fact include an award of future damages, the trial court shall comply with the following in rendering its judgment in the case:
"(1) Judgment shall be entered against the defendant for all past damages and punitive damages assessed against the defendant by the trier of fact.
"(2) If the award of future damages assessed by the trier of fact is $150,000.00 or less, the trial court shall enter judgment against the defendants for the amount of such future damages.
"(3) If the award of future damages assessed by the trier of fact is greater than $150,000.00, the trial court shall enter judgment as follows:
"a. Judgment shall be entered against the defendant for $150,000.00 of such future damage.
"b. If, as part of the plaintiff's contract with his attorney, the plaintiff is obligated to pay his attorney a fee based on that portion of the award of future damages which exceeds $150,000.00, the court shall determine what portion of the award of future damages in excess of $150,000.00 is owed to the attorney under the contract and shall enter judgment for the remainder of the award of future damages in excess of $150,000.00 as provided in c, below. As to that portion of the award of future damages in excess of $150,000.00 which is owed to the plaintiff's attorney, that portion shall be reduced to present value by the court and judgment shall be entered against the defendant for the reduced amount.
"c. 1. For that portion of a future damage award in excess of $150,000.00 and in excess of the attorney's fee subject to b, above, judgment shall be entered requiring the defendant to pay that portion of such future damages by periodic payments over a period of years not to exceed such period of years as, according to the evidence offered during the trial of the case, such future damages may be incurred. In entering a judgment against the defendants ordering the payment of future damages by periodic payment, the trial court shall make a specific finding as to the dollar amount of periodic payments which will compensate the judgment creditor for such future damages as the same may be incurred, as determined *187 from the evidence offered during the trial of the case. If, or to the extent that, the evidence offered at trial did not indicate the approximate time or time frame or both within which the future damages would be incurred, the trial court, for the purpose of determining the amount of periodic payments and the interval between such payments, shall conclusively presume that such damages will be incurred throughout the life expectancy of the judgment creditor on an equal periodic basis. The judgment ordering payment of future damages by periodic payments shall specify the recipient or recipients of the payments, the dollar amounts of the payments, the interval between payments, and the number of payments or period of time over which payments shall be made. The total amount of all periodic payments when added to the sum of $150,000.00 and when added to that portion of the future damages award, not reduced to present value, which was used to calculate the attorney's fee in paragraph b, above, shall not exceed the total amount of future damages contained in the verdict of the trier of fact.
"2. As a condition to authorizing periodic payments for future damages, the court must receive adequate assurance that the defendant can and will make all required payments. Such assurance may include the requirement that the defendant either have sufficient financial ability to make all required payments, post adequate bond or other security, give evidence that there exists an insurance company, registered in this state, which is obligated to pay the judgment, or purchase an annuity of sufficient value to pay the future damages as structured, or any accelerated payments of those damages which might be required by this article. Nothing contained herein shall be construed as limiting the authority of the trial court to order a new trial, enter a judgment notwithstanding the verdict, or order a remittitur of damages. The provisions of this section shall also apply to any judgment following remittitur.
"3. An award of future damages shall not be reduced to present value by the court, except as required in b, above, and no interest is to be charged on said damages. Evidence of the present value of future damages is inadmissible in cases covered by this article, except at a hearing authorized by section 6-11-5, herein. If, however, the court determines that damages which should be structured pursuant to c, above, cannot be structured due to the failure of the defendant to provide the financial assurances required in c 2, above, that portion of the future damage award shall be reduced to present value by the court prior to entry of judgment."
Article I, § 11, of the Constitution provides:
"That the great, general, and essential principles of liberty and free government may be recognized and established, we declare:
". . . .
"That the right of trial by jury shall remain inviolate."
This is not the only place within the declaration of rights (Art. I, §§ 1-36) that the word "inviolate" is used. In § 36, the following appears:
"That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate."
(Emphasis added.)
"Inviolate" is defined in Black's Law Dictionary 826 (6th ed. 1990) as "Intact; not violated; free from substantial impairment."
Insofar as legislative power is concerned, § 11 of the Constitution has never been interpreted by this Court or the Courts of *188 Appeals of Alabama as doing more than restricting the legislature from denying or impairing the fundamental requisites of a jury, which are that the jury be composed of 12 persons, that they be impartial, and that their verdict be unanimous (Kirk v. State, 247 Ala. 43, 22 So.2d 431 (1945); Baader v. State, 201 Ala. 76, 77 So. 370 (1917); Culbert v. State, 52 Ala.App. 167, 290 So.2d 235 (1974); Brown v. State, 45 Ala.App. 391, 231 So.2d 167 (1970); Dixon v. State, 27 Ala.App. 64, 167 So. 340 (1936), cert. denied, 232 Ala. 150, 167 So. 349 (1936); Judge Walter B. Jones, Trial by Jury in Alabama, 8 Ala.L.Rev. 274, 277 (1956); 16 Ruling Case Law 181 (1917)), in all cases in which the right of trial by jury existed at common law and in all cases where the right of trial by jury was secured by statute at the time the Alabama Constitution of 1901 was ratified.[2]Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974); Alford v. State ex rel. Attorney General, 170 Ala. 178, 54 So. 213 (1910); Tims v. State, 26 Ala. 165 (1855).
In Baader v. State, 201 Ala. at 77-78, 77 So. at 371-72, Justice Thomas wrote for this unanimous Court:
"That the right of trial by jury may be regulated by the Legislature has been often reaffirmed; but legislative restrictions or amplifications must not be of such character as to deny or impair any of the fundamental requisites of a jury; that is, they may not vary the constituent number, nor provide for other than an unanimous verdict, nor introduce regulations leading away from impartiality. These original factors are necessary for the integrity of the jury and the jury trial, being `impliedly, if not expressly, fixed by the Constitution.' Proffatt on Jury Trial, § 106; Sedgewick on Stat. & Const.Law, p. 486; Spivey v. State, 172 Ala. 391, 397, 56 South. 232 [1911]; 16 R.C.L. 181."
Judge Walter B. Jones, Trial by Jury in Alabama, 8 Ala.L.Rev. at 277 (1956), wrote:
"The fundamental requisites of trial by jury are that (1) the jury shall be composed of twelve persons, (2) that they shall be impartial, and (3) that the verdict must be unanimous. Legislative regulations do not infringe our constitutional provision that the right of trial by jury shall remain inviolate so long as the essential elements of number, impartiality, and unanimity are preserved."
Judge Cates, writing for the Court of Criminal Appeals in Brown v. State, 45 Ala.App. at 393, 231 So.2d at 169, wrote: "All that the Constitution requires of a jury is that it be impartial, duodecimal and unanimous."
It is obvious from the proceedings of the Constitutional Convention of 1901 that the requirements that a jury's verdict be unanimous and that the number of jurors be 12 were set in stone by §§ 11 and 36 and were to remain free from encroachment by any department of government. See Official Proceedings, Constitutional Convention of 1901, Vol. 2, pp. 1677-1727. During the convention, a minority report sought to change what is now § 11 to: "The right of trial by jury as heretofore enjoyed, shall remain inviolate; but in civil actions three-fourths of the jury may render a verdict." This proposal was defeated by 81 votes to 29 votes. The number 12[3] was clearly not *189 to be violated, for the last delegate to speak before the vote at which the minority report was defeated, stated:
"[I]f ... you ... adopt the proposition contained in the minority report of the Committee, the same power lies in the hands of designing and unscrupulous men to go to the men who own their little farms all over Alabama, and say to them, this Constitution has done what it was predicted it would do, it has tampered with the jury system of Alabama. It has put it in the hands of the fellow that has got a mortgage on your property, to get it from you by a verdict of nine men, when the Constitution since the dawn of time has said twelve men, and that proposition would give you trouble world without end in securing the adoption of [the] Constitution.
"I appeal to this Convention not to tamper with the bill of rights.... [I]t is part and parcel of the rights reserved to the people, and I appeal to this Convention not to touch them, but let them stand as they have stood since the dawn of Alabama's history, the bulwark of the people against oppression of all sorts."
Official Proceedings, at 1723.
As for impartiality, that ideal, along with the ideal that a jury be composed of competent members, suffered in the debate, for, to support the amendment, there were allegations "that bribery stalks at noon time and sitteth in the courthouse in the evening hour." Id. at 1719. To oppose the amendment, there was the allegation that "[n]ine times out of ten you cannot get over three smart men on the jury on an average in this State. You know that is a fact." Id. at 1704.
Justice Jones, for a unanimous Court, wrote in Gilbreath v. Wallace, 292 Ala. at 271, 292 So.2d at 655, "In Alabama the basic principles which apply to constitutional juries in criminal cases also apply in civil cases."
Query: The Constitution requires a 12-person, impartial jury that unanimously does what?
There is apparent in the Official Proceedings, Constitutional Convention of 1901, supra, an implicit understanding that a jury must function as a factfinder, for why would there be concern about whether the 12 persons were in complete agreement or accord, if it were not on the resolution of the facts necessary to determine guilt or innocence or to determine whether the plaintiff or the defendant prevails?
Section 6.11 of Amendment 328 to the Constitution, which was proclaimed ratified on December 27, 1973 (Proclamation Register No. 3, p. 32), provides:
"The supreme court shall make and promulgate rules governing the administration of all courts and rules governing practice and procedure in all courts; provided, however, that such rules shall not abridge, enlarge or modify the substantive right of any party nor affect the jurisdiction of circuit and district courts or venue of actions therein; and provided, further, that the right of trial by jury as at common law and declared by section 11 of the Constitution of Alabama of 1901 shall be preserved to the parties inviolate. These rules may be changed by a general act of statewide application."
(Emphasis added.)
There is some disagreement among the Justices on this Court as to what it is that the term "[t]hese rules" in the last sentence of § 6.11 does apply (see the per curiam opinion and the dissenting opinion of Houston, J., in Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d *190 414 (Ala.1991)); however, all Justices agree that the words "[t]hese rules" in the last sentence of § 6.11 clearly do not refer to the proviso addressing the right to trial by jury that precedes them and therefore do not empower the legislative department to change the right of trial by jury "by a general act of statewide application." The word "rule," as a noun, is defined as "[a]n established standard, guide, or regulation. Prescribed guide for conduct or action, regulation or principle [citation omitted]. A principle or regulation set up by authority, prescribing or directing action or forbearance; as, the rules of a legislative body, of a company, court, public office, of the law, of ethics." Black's Law Dictionary 1331 (6th ed. 1990). As a noun, the word "right" denotes "a power, privilege, faculty, or demand, inherent in one person and incident upon another"; and, giving the word a juristic content, "a `right' is well defined as `a capacity residing in one man of controlling, with the assent and assistance of the state, the actions of others.'" Black's Law Dictionary 1324 (6th ed. 1990).[4]
*191 When writing of the right to trial by jury there is, on one hand, a tendency to overwrite, to be too expansive of the right: to use "encomiums" and "panegyrics" (Alford v. State ex rel. Attorney General, 170 Ala. 178, 183-220, 54 So. 213, 214-25 (1910) (Mayfield, J., dissenting)); and, to use words unduly restricting any change in the jury system, such as "forbid[ding] the State through the legislative, judicial, or executive departmentone or allfrom ever burdening, disturbing, qualifying, or tampering with this right" (Gilbreath v. Wallace, 292 Ala. at 271, 292 So.2d at 651); and "never ... judicially abolish, curtail, or diminish ... the right" (Jawad, supra). On the other hand, there is the tendency to underwrite, to be unduly restrictive of the right: "Legislative regulations do not infringe our constitutional provision that the right to trial by jury shall remain inviolate so long as the essential elements of number, impartiality, and unanimity are preserved." Jones, 8 Ala.L.Rev. at 277; Baader v. State, supra; Brown v. State, supra.
The passage quoted above from Jawad should have been tightened to correctly state the judicial prohibition involved in that case: "There can never be good reasons for attempting to judicially abolish, curtail, or diminish the factfinding function of a jury."
If "[t]o provide that the right of trial by jury shall remain inviolate is to forbid the legislative ... department from ever burdening, disturbing, qualifying, or tampering with this right," (Gilbreath v. Wallace, 292 Ala. at 271, 292 So.2d at 651), can the legislature change the mode of selecting the venire from which jurors are chosen?
In 1901, in each county the county commissioners or members of the board of revenue constituted a board of jury commissioners (Code of Alabama 1897, § 4976); that board selected from male residents of the county over 21 and under 60 years of age the names of such persons not exempt from jury duty "as in their opinion [were] fit and competent to discharge the duties of... petit jurors with honesty, impartiality and intelligence, and [were] esteemed in the community for their integrity, good character, and sound judgment." (Code 1897, § 4982). It was from these names that the petit jurors were selected. There were numerous persons exempted from jury duty (Code 1897, § 4986), including, but not limited to teachers, attorneys, judges, physicians, dentists, ministers, firemen, students, school board members, mailmen, wardens, and county commissioners.
Now, a jury commission from each county (Ala.Code 1975, § 12-16-30) compiles a master list of all the persons in the county who may be called for jury duty (Ala.Code 1975, § 12-16-57); and no citizen can be excluded from jury service on account of race, color, religion, sex, national origin, or economic status (Ala.Code 1975, § 12-16-56). All persons selected for jury service must be selected at random from a fair cross section of the population of the area served by the court (Ala.Code 1975, § 12-16-55). No qualified prospective juror is exempt from jury service. (Ala.Code 1975, § 12-16-62). Sections 12-16-55, -56, -57, and -62 were enacted in 1978, after Amendment 328 was ratified.
In lieu thereof, Ala.Code 1975, §§ 12-16-145 and -146, provide an alternative plan and procedure for qualifying, selecting, drawing, summoning, and empaneling juries. Do these legislative changes burden, disturb, qualify, or tamper with the right to trial by jury? These were enacted after the ratification of the Constitution of 1901.
Whether the change in the composition or selection of potential jurors violates or substantially impairs the right secured by § 11 of the Constitution is not before us; and the mention of this is not to suggest that it does or that it does not.
*192 Judge Cates in Brown v. State, 45 Ala. App. at 395, 231 So.2d at 171, wrote: "The mode of jury selection is basically one of statutory choice"; however, that was the same opinion in which Judge Cates wrote that § 11 requires only that a jury "be impartial, duodecimal and unanimous."
The general affirmative charge with hypothesis was used in Alabama prior to 1901. Alabama G.S.R.R. v. McAlpine & Co., 80 Ala. 73, 74 (1885); McElroy, The General Affirmative Charge with Hypothesis in Alabama, 1 Ala.L.Rev. 151 (1949). Where the party with the burden of proof presented evidence of each element of his cause of action by uncontradicted testimony, the case was sent to the jury but with a special direction that "if the jury believe the evidence; it must find for the plaintiff." This Court changed this by the last sentence of Rule 50(a), A.R.Civ.P.: "The order of the court granting a motion for a directed verdict is effective without any assent of the jury." (Emphasis added.)
At common law, the verdict of the jury had to be a general verdict, and no judgment could be rendered on a special verdict. Clay v. State, 43 Ala. 350 (1869). By Rule 49(b), A.R.Civ.P., this Court authorized special verdicts. According to the Committee Comments, "Rule 49(b) expressly cures the common law difficulty by express provision."
Whether these changes in the jury's function violate or substantially impair the right secured by § 11 and § 6.11 of Amendment 328 of the Constitution is not before us, and the mention of them is not to suggest that they do or that they do not.
It is obvious that neither the legislature nor the judiciary has considered §§ 11 and 36 of the Constitution as sacrosanct when dealing with certain aspects of trial by jury.
Under Ala.Code 1975, § 6-11-3(3)c.3., "Evidence of the present value of future damages is inadmissible in cases covered by this article, except at a hearing authorized by section 6-11-5, herein."
Alabama Code 1975, § 6-11-5, provides:
"The court may conduct hearings and receive such evidence as is deemed necessary in order to make the determinations required in section 6-11-3...."
Therefore, § 6-11-3(3)c.3. and § 6-11-5 do transfer the function of determining the present value of future compensatory damages from the jury to the trial court. Was this a function of the jury at the time the Constitution of 1901 was ratified?
What are compensatory damages, if not an element of a cause of action? To the bench and bar all elements of a cause of action are essential in the trial of an action; but to a not-so-esoteric groupto us, the peopleas parties to litigation, whether damages are awarded and, if awarded, the damages awarded are the essence of the action, the indispensable property of and the reason for bringing and for defending the action.
At common law as it existed in 1819, and in 1901, it was a jury function to assess compensatory damages.
In Wood's Mayne on Damages § 791, at 739 (3rd English and 1st American ed. 1880), the following appears:
"It was always admitted that in cases where the amount of damages was uncertain, their assessment was a matter so particularly within the province of the jury that the Court could not alter it."
We are aware that the United States Supreme Court in Tull v. United States, 481 U.S. 412, 425-26, 107 S.Ct. 1831, 1840, 95 L.Ed.2d 365 (1987), uses language suggesting that a jury is never required to assess any form of damages:
"The Seventh Amendment is silent on the question of whether a jury must determine the remedy in a trial in which it must determine liability. The answer must depend on whether the jury must shoulder this responsibility as necessary to preserve the `substance of the common-law right of trial by jury.' Colgrove v. Battin, 413 U.S. 149, 157, 93 S.Ct. 2448, 2452, 37 L.Ed.2d 522 (1973). Is a jury role necessary for that purpose? We do not think so. `"Only those incidents which are regarded as fundamental, as inherent in and of the essence of the system of trial by jury, are placed *193 beyond the reach of the legislature."' Id., at 156, n. 11, 93 S.Ct. at 2452, n. 11 (quoting Scott, Trial by Jury and the Reform of Civil Procedure, 31 Harv. L.Rev. 669, 671 (1918)). See also Galloway v. United States, 319 U.S. 372, 392, 63 S.Ct. 1077, 1088, 87 L.Ed. 1458 (1943) (`[T]he Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements.' Congress' authority to fix the penalty by statute has not been questioned, and it was also the British practice, see, e.g., Atcheson v. Everitt, 1 Cowper 382, 98 Eng.Rep. 1142 (K.B.1776). In the United States, the action to recover civil penalties usually seeks the amount fixed by Congress. See, e.g., United States v. Regan, 232 U.S. [37], at 40, 34 S.Ct. [213], at 213 [58 L.Ed. 494 (1914) ] Hepner v. United States, 213 U.S. [103], at 109, 29 S.Ct. [474] at 477 [53 L.Ed. 720 (1909)]. The assessment of civil penalties thus cannot be said to involve the `substance of a common-law right to a trial by jury,' nor a `fundamental element of a jury trial.'"
The Chief Justice and six Justices concurred. Justice Scalia, joined by Justice Stevens, dissented on this point "because in my view," wrote Justice Scalia, "the right to trial by jury on whether a civil penalty of unspecified amount is assessable also involves a right to trial by jury on what the amount should be." 481 U.S. at 427, 107 S.Ct. at 1840-41.
We are not dealing with a civil penalty in this case, as the United States Supreme Court was in Tull, but with compensatory damages, the remedy for an injury done to a person and to which the person has a right by § 13 of the Constitution.
At common law, it was a jury function to determine the life expectancy of a plaintiff who had suffered permanent injury. Alabama Mineral R.R. v. Jones, 114 Ala. 519, 21 So. 507 (1897). Mortality tables were admissible, but the tables were one of many factors to be considered by the jury. 114 Ala. at 533, 21 So. at 510-11; Mary Lee Coal & Ry. Co. v. Chambliss, 97 Ala. 171, 11 So. 897 (1892). Subsequently, the legislature adopted statutes concerning mortality tables, Ala.Code 1975, §§ 35-16-3 and 35-16-4. Since the adoption of these statutes, this Court has reiterated that mortality tables are not conclusive evidence of the life expectancy of a particular person. In Louisville & N.R.R. v. Richardson, 285 Ala. 281, 283, 231 So.2d 316 (1970), this Court held:
"Mortality tables, showing at any age the probability of the duration of life, or life expectancy, and expert testimony relating to the present value of any loss sustained, are competent evidence, where the injury is permanent, to assist the jury in arriving at a fair recompense for the loss of what the injured person would otherwise have earned in his trade.... The mortality tables are not conclusive evidence of the life expectancy of a particular person, but are accepted only as an aid to the jury in connection with other relevant facts in arriving at the probable duration of the life of a person...."
(Emphasis added.)
The legislature, in adopting the mortality tables, did not prescribe the manner in which juries arrive at an amount of damages to compensate an injured plaintiff for his loss of future earnings.
The determination of the amount to which a plaintiff is entitled for his loss of future earnings was a jury question in a case tried to a jury, before the ratification of the Constitution. South & North Ala. R.R. v. McLendon, 63 Ala. 266, 273 (1879). At the time of the ratification of the Constitution, in cases tried to a jury, it was the jury's function to reduce future earnings to present value or present worth. McAdory v. Louisville & N.R.R., 94 Ala. 272, 10 So. 507 (1892).
The general rule regarding present value is aptly stated in 22 Am.Jur.2d Damages § 174, at 156-57 (1988):
"When the plaintiff is compensated for a decrease in his earning capacity, he is awarded a sum of money now for funds whichhad it not been for the injuryhe would have received at some future dates. His wages or salary would have *194 been paid to him during the remainder of his work-life; the award compensating him for a decrease in his ability to earn wages or salary is paid to him in a lump sum and in advance of the date or dates on which he would normally have received the payments. Thus, if the court, for this element of damages, awards a sum of money equal to the total decrease in plaintiff's earning capacity without reduction to present worth, it is ignoring the fact that money has the power to earn money.
"In those jurisdictions which have not chosen to wholly or partially ignore this fact, on the grounds that doing so will compensate for erosion of the purchasing power of money, it is held that damages should be reduced to reflect only the present value of the plaintiff's decreased earning capacity. Courts following this rule state that the plaintiff is not entitled to a sum of money, the interest on which compensates him for his decreased earning capacity, because this would leave the principal amount intact, resulting in overcompensation. The amount awarded should consider the use of both the principal and the interest as compensating for the decreased earning capacity."
22 Am.Jur.2d Damages § 176 at 157, contains the following discussion of the determination of a discount rate:
"The goal of the personal injury award for impairment of future earning capacity should be to give the plaintiff that sum of money which, if invested, will return to the plaintiff the amount of the decrease in his earning capacity over the period of the injury if not permanent, or, if permanent, over the period of his life expectancy (or according to some courts, work expectancy) andat the termination of that periodbe reduced to no value. For this purpose, an interest rate must be selected. Courts generally admit evidence submitted on the question of the rate of interest and then leave to the jury under a general instruction the determination of the rate of return."
See Louisville & N.R.R. v. Trammell, 93 Ala. 350, 9 So. 870, 873 (1891) (a nonjury case); McAdory v. Louisville & N.R.R., 94 Ala. 272, 10 So. 507 (1892); Alabama Pattern Jury Instructions: Civil, 1., 11.11 (1974). In Birmingham Ry. Light and Power Co. v. Wright, 153 Ala. 99, 44 So. 1037 (1907), the Court indicated that Trammell and McAdory should be limited to death cases for which compensatory damages were recoverable because "[w]here the injury does not result fatally, the plaintiff will be the beneficiary of the damages recovered, and to allow him the value of his life, which he yet has, is, of course, absurd." 153 Ala. at 108, 44 So. at 1040. We are not awarding the value of life, but the present value of decreased future earnings. We cannot comprehend the statement quoted from Wright, but it cannot properly relate to the function of reducing the award for the decrease in future earning capacity to present value; however, if it does relate to that function, it is wrong and it is overruled to the extent that it does so relate.
The legislature has adopted a discount rate of six percent (6%) to be used in reducing compensation paid under the Alabama workmen's compensation provisions, Code, § 25-5-83, see Ex parte St. Regis Corp., 535 So.2d 160, 162 (Ala.1988). However, the legislature has not adopted a discount rate to be applied in other areas.
Section 35-16-1 authorizes the superintendent of insurance and the superintendent of banks, within 30 days after final adjournment of each regular session of the legislature, to prepare an annuity table showing the present cash value of an annuity of $100 per month, month by month from 2 to 480 months at the following rates: 2, 2½, 3, 3½, 4, 4½, 5, 5½, and 6 percent. The secretary of state causes that table to be published in the bound volume of the acts of the legislature. See 1990 Acts of Alabama, Vol. 2, page 1588. Section 35-16-2 provides that these tables shall be received in all courts of this state as evidence of the facts therein stated, but that "nothing contained in this chapter shall affect the admissibility of other competent evidence when offered in a lawful and proper manner." Therefore, the discount rate to be applied in this case is a *195 question of fact for the jury. See 8 Am. Jur., Proof of Facts, Discount Rate, § 3, pp. 12-13 (1976).
It is apparent that the sentence "The fact-finder shall not reduce any future damages to present value," contained in § 6-11-3 and in § 6-11-5, does take away from the jury a factfinding function (when a jury is the factfinder) that was within the province of the jury at the time of the ratification of the Constitution of 1901.
Do these Code sections violate § 11 of the Constitution? And, insofar as the judiciary is concerned, do § 6-11-3(3)c. and § 6-11-5 violate § 6.11 of Amendment 328 of the Constitution?
The Seventh Amendment to the United States Constitution was ratified approximately 28 years before Alabama's first Constitution was ratified. So, we look to the historical events surrounding the Seventh Amendment for enlightenment as to what was excepted out of the state's general powers of government to "forever remain inviolate" (Article I, § 36, Alabama Constitution of 1901) (Article I, § 30, Alabama Constitution of 1819), insofar as "the right of trial by jury" is concerned.
Alexis de Tocqueville, Democracy in America 293 (1835; P. Bradley, rev. ed. 1945), astutely observed, "The jury is above all, a political institution, and must be regarded in this light in order to be duly appreciated."
The right to a civil jury played a bit part, but a greater part than any other right guaranteed by the Bill of Rights, in the 1787 Constitutional Convention at Philadelphia. The only recorded issue made of the absence of a bill of rights at that convention, that this Court has been able to find, was an objection that the document lacked a guarantee of jury trials in civil cases.
On September 12, 1787, Hugh Williamson of North Carolina raised this objection to the lack of a guarantee of a civil jury trial:
"Mr. Williamson, observed to the House that no provision was yet made for juries in Civil cases and suggested the necessity of it.
"Mr. [Nathaniel] Gorham [of Massachusetts]. It is not possible to discriminate equity cases from those in which juries are proper. The Representatives of the people may be safely trusted in this matter.
"Mr. [Elbridge] Gerry [of Massachusetts] urged the necessity of Juries to guard agst. corrupt Judges. He proposed that the Committee last appointed should be directed to provide a clause for securing the trial by Juries.
"Col: [George] Mason [of Virginia] perceived the difficulty mentioned by Mr. Gorham. The jury cases cannot be specified. A general principle laid down on this and some other points would be sufficient. He wished the plan had been prefaced with a Bill of Rights, & would second a Motion if made for the purposeIt would give great quiet to the people; and with the aid of the State declarations, a bill might be prepared in a few hours.
"Mr. Gerry concurred in the idea & moved for a Committee to prepare a Bill of Rights. Col: Mason 2ded a motion.
"Mr. [Roger] Sherman [of Connecticut] was for securing the rights of the people where requisite. The State Declarations of Rights are not repealed by this Constitution; and being in force are sufficientThere are many cases where juries are proper which cannot be discriminated. The Legislature may be safely trusted.
"Col. Mason. The Laws of the U.S. are to be paramount to State Bills of Rights...."
J. Madison, Debates in the Federal Convention, in 2 Records of the Federal Convention of 1787 (M. Farrand ed. 1911) n. 54, at 587-88.
On September 15, 1787, Charles Pickney of South Carolina and Gerry moved to annex to the end of Art. III, § 2, paragraph 3: "And a trial by jury shall be preserved as usual in civil cases." This proposal was defeated. J. Madison, Debates in the Federal Convention, in 2 Records of the Federal Constitution of 1787 at 628.
*196 Professor Charles W. Wolfram, in The Constitutional History of the Seventh Amendment, 57 Minn.L.Rev. 639 (1973), recounting the Antifederalists' attempts to defeat ratification of the United States Constitution without a bill of rights, lists and discusses several distinct and specific arguments in favor of civil jury trials:
"[T]he protection of debtor defendants; the frustration of unwise legislation; the overturning of the practices of courts of vice-admiralty; the vindication of the interests of private citizens in litigation with the government; and the protection of litigants against overbearing and oppressive judges [if such there be or ever have been]."
57 Minn.L.Rev. at 670-71.
However, from a historical approach, it has not been determined what features of a civil jury trial were preserved to parties to civil litigation from the United States and its officers, agents, and employees.
"Others have already delved into history for specific answers to these questions and have found none. None can be reported from this author's research into the ratification controversy. It is clear that the antifederalists desired a strong and significantly independent role for the jury and there is some indication that this role was envisioned not to involve the risk of correction by the attending judge. Nothing has been found that bears explicitly on such questions as the size of the jury, the requirement of unanimity, or even the requirement of secrecy for their deliberations. It is not at all surprising that discussion of such secondary matters did not arise during the period under review. The major issues of the day were the large stakes of local control versus centralized power. Even at the level of personal rights and privileges, the larger and more critical task was to secure in some form a guarantee of such rights as those of free speech and press and the right to civil and criminal jury trial. Resistance [on] the part of federalists to the basic idea of a national bill of rights was too general to permit the introduction of matters of such relatively trivial significance as the size of juries or the precise line that should delineate the provinces of jury and judge."
Wolfram, 57 Minn.L.Rev. at 723-25. (Emphasis added.)
When the constitutionality of a duly enacted act of the legislature is challenged, we must remember that all questions of "propriety, wisdom, necessity, utility, and expediency" are exclusively for legislative determination. Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944), cert. dismissed, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945). When the constitutionality of a duly enacted act is challenged, the only question for this Court is that of legislative power; and to determine that, we must determine whether the Constitution excepted that power from the power given the legislature.
Each of the Alabama Constitutions, from the Constitution of 1819 (Article I, §§ 28 and 30) to the present Constitution of 1901 (Article I, §§ 11 and 36), has excepted out of the general powers of government, the power to violate the right of trial by jury. What does that right entail? Twelve persons, who are impartial and who unanimously resolve disputed facts, following the instructions on the law to be applied, which are given to them by the trial court. The legislature can change the law, including the law of damages; however, the legislature cannot, just as we have held the judiciary cannot (Jawad v. Granade, supra), impinge upon the factfinding function of the jury.
We do not intend to lead a crusade "to a constitutional holy land"[5]; but we must agree with Justice Stone, who in Sadler v. Langham, 34 Ala. 311, 335 (1859), quoted with approval the following:
"`It is highly probable that inconveniences will result from following the constitution *197 as it is written. But that consideration can have no weight with me. It is not for us, but for those who made the instrument, to supply its defects. If the legislature or the courts may take that office on themselves, or if under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government. Written constitutions will be more than useless.

"`Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring powersome evil to be avoided, or some good to be attained, by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But, if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary, in enlarging the powers of the government, opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them.' Oakley v. Aspinwall, 3 N.Y. 547, 568."
(Emphasis added.)
In this case, Clark had a constitutional right "`to a remedy by due process' for any injury done him, in his ... person." Constitution, § 13. "Remedy" is defined as "[t]he means by which a right is enforced or the violation of a right is ... compensated." Black's Law Dictionary, 1294 (6th ed. 1990). Clark had demanded a jury for the trial of his action; therefore, Clark had a right ("`a capacity residing in one man of controlling, with the assent and assistance of the state, the actions of others,' " Black's Law Dictionary, supra) to have the jury determine whether a compensable injury had been done him, in his person; and, if so, to determine the amount necessary to compensate him for that injury.
Therefore, the right that an individual, as a party to civil litigation, has to a trial by jury is protected by § 11 of the Constitution from the legislative, executive, and judicial departments of government and by § 6.11 of Amendment 328 from the judicial department. It is the right to have a jury of 12 impartial people unanimously resolve disputed facts.
Not only does Ala.Code 1975, § 6-11-3, remove from the jury the function of factually determining the amount of a plaintiff's remedy for an injury done to the plaintiff's person, but it also requires all defendants to pay an excessive amount on the first $150,000 of future damages when future damages are assessed. Defendants who are required to pay any future damages (and in the briefs accompanying this certified question there is an unsubstantiated statement that evidence was presented to the Alabama legislature prior to the enactment of § 6-11-3 that awards of future damages in most cases did not exceed $150,000) do not have the initial $150,000 of future damages reduced to present value, either by the jury or by the trial court. Therefore, § 6-11-3, as written, provides a remedy in excess of that due a plaintiff under the common law, as to any future damages not exceeding $150,000. We do not mean to imply that the legislative department cannot by another general act abolish the procedure or rule requiring that all damages for a decrease in future earnings be reduced to present value or even abolish all damages for loss of future earnings, Gasoline Products Co. v. Champlin, supra. That is not before us, for § 6-11-6 *198 provides: "Nothing in this article shall be construed to alter or affect the nature, elements, form, or amount of damages recoverable in any action."
Act No. 87-183, Acts of Alabama 1987 (Ala.Code 1975, §§ 6-11-1 through 6-11-7), contains a severability clause (§ 7):
"If any section, clause, provision, or portion of this act shall be held invalid or unconstitutional by any court of competent jurisdiction, such holding shall not affect any other section, clause, or provision of this act which is not in or of itself invalid or unconstitutional."

ANSWER TO CERTIFIED QUESTION:
The sentence in § 6-11-1 providing that "The fact-finder shall not reduce any future damages to present value"; all of § 6-11-3; and, consequently, all of § 6-11-4, since it has no operative effect apart from § 6-11-3; and all of § 6-11-5 violate §§ 11 and 13 of the Constitution, when a jury has been demanded, and as applied to the case of Billy Ray Clark and Halliburton Industrial Services Division v. Container Corporation of America, Inc.
We have a real concern about § 6-11-4(4) ("No certificate of judgment shall issue or be recorded against any defendant for that portion of an award of future damages which is structured") on several constitutional grounds; however, that sentence is inoperative without § 6-11-3; therefore, we omit any separate discussion of that sentence.
We also omit any discussion of whether § 6-11-3 violates Article I, § 6, or Article III, § 42, of the Constitution, because such a discussion is not necessary for the resolution of the case before the United States District Court for the Southern District of Alabama.
CERTIFIED QUESTION ANSWERED.
SHORES, ADAMS, STEAGALL, KENNEDY and INGRAM, JJ., concur in the result.
MADDOX, J., dissents.
ADAMS, Justice (concurring in the result).
Although I agree that Ala.Code 1975, § 6-11-3, violates the right to a trial by jury, I fundamentally disagree with the premises upon which the principal opinion stands. The opinion purports to hold that § 6-11-3 violates Ala. Const.1901, art. I, § 11, because the statute impairs a jury's factfinding function. However, the opinion appears to stand on at least three distinct propositions, none of which, in my view, is supported by law or logic. Consequently, I write specially to point out what I perceive to be the most serious weaknesses in the analysis of this constitutional issue.
The opinion's analysis of the unconstitutionality of § 6-11-3 begins with what I shall call "Proposition One," which is that "§ 11 of the Constitution has never been interpreted by this Court ... as doing more than restricting the legislature from denying or impairing the fundamental requisites of a jury, which are that the jury be composed of 12 persons, that they be impartial, and that their verdict be unanimous." At 187-188. A second proposition found in the opinion asserts that the second proviso in Amendment 328, § 6.11, "added something" not originally guaranteed by § 11, that is, an express reference to the common law comparable to that contained in U.S. Const. amend. VII. The opinion also appears to rest on a third proposition, which is that Amendment 328, § 6.11, preserves for Alabama litigants constitutional protection for the factfinding function of juries as that function existed at common law. The opinion consequently invites the conclusion that if the factfinding function of the jury is protected by the Constitution of Alabama, then it is protected by Amendment 328, § 6.11, not by § 11.

Proposition One
This Court has never, in a proper holding, narrowly interpreted the scope of § 11 as guaranteeing only (1) impartiality, (2) duodecimality, and (3) unanimity, to the exclusion of the jury's factfinding function as that function existed at common law. The language that gives rise to this proposition *199 springs from dictum in Baader v. State, 201 Ala. 76, 77 So. 370 (1917).
In that case, the defendant in a misdemeanor prosecution attempted to waive his right to a jury trial under a statute that required defendants, in order to preserve that right, to demand a trial by jury within five days of arrest or of the giving of bond. Nevertheless, at the request of the prosecution, which was made "several months after the prosecution had begun," the trial court conducted a jury trial. The defendant contended that his constitutional right to a fair trial was violated by this noncompliance with the statute. This Court, holding that the prosecution's request for a jury trial was not timely, reversed the judgment of the trial court. Although no issue was raised regarding the power of the legislature to provide for a waiver of the right to a trial by jury, the Court preliminarily discussed the subject in general terms. The Court's discussion, which was entirely unnecessary to the disposition of the issue presented, contained the statement that forms the basis of Proposition One.
The one case cited in Baader in support of this dictum was Spivey v. State, 172 Ala. 391, 397, 56 So. 232 (1911). Spivey, however, contains no formula regarding the "fundamental requisites of a jury" such as that which appears in Baader; nor is such a restriction on the scope of constitutional protection fairly inferable from Spivey.
The Baader dictum was once more cited by this Court in Kirk v. State, 247 Ala. 43, 22 So.2d 431 (1945). Immediately following its reference to the language in Baader, however, this Court added the following qualification:
"It should be clearly understood, however, that we are not dealing in the case at bar with an infringement of constitutional rights, but with the right of the accused at his election to forgo rights granted by the Constitution and especially the right to waive such rights when the public policy of the State is expressed in the statute set forth above."
Kirk, 247 Ala. at 45, 22 So.2d at 432 (emphasis added). It is thus clear that an application of the tripartite formula expressed in the Baader dictum was equally unnecessary to the resolution of the issue in Kirk.[6]
In fact, the principal opinion cites no case in which the Baader dictum formed the basis of this Court's holding, nor has my research revealed any. Moreover, the opinion ultimately concedes that the Baader dictum was "underwritten," that is, that it clearly did not describe the totality of protection afforded the role of juries by § 11. Consequently, I must conclude that this Court has never subscribed to the view that § 11 preserved only (1) impartiality, (2) duodecimality, and (3) unanimity, to the exclusion of the jury's traditional factfinding function.
In this connection, the opinion seems to imply that statutes regulating the "qualifying, selecting, drawing, summoning, and empaneling [of] juries" do not offend § 11. At 191. If that is so, it is because those statutes do not impair the jury's truly essential function, which is to resolve disputed issues of fact.

Proposition Two
Amendment 328, § 6.11, through its express reference to the common law, afforded Alabama litigants no guarantees that were not already provided by § 11. The principal opinion properly recognizes that the fundamental function of the common law jury was to resolve disputed issues of fact. Baltimore & Carolina Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636 (1935). Based on its application of Proposition One, however, the opinion attempts to distinguish § 11 from the Seventh Amendment, concluding that, unlike the Seventh Amendment, § 11 did not preserve that factfinding function. Enigmatically, it then likens the two constitutional provisions, stating:

*200 "The Seventh Amendment to the United States Constitution was ratified approximately 28 years before Alabama's first Constitution was ratified. So, we look to the historical events surrounding the Seventh Amendment for enlightenment as to what was excepted out of the state's general powers of government to `forever remain inviolate'... insofar as `the right of trial by jury' is concerned."
At 195. (Emphasis added.)
In attempting to distinguish the protections afforded under the two provisions, the principal opinion goes seriously awry. "The Seventh Amendment is not materially different from Section 11." Poston v. Gaddis, 335 So.2d 165, 167 (Ala.Civ.App.), cert. denied, 335 So.2d 169 (Ala.1976). Both constitutional provisions preserve the right to trial by jury "as it was at common law." Poston, 335 So.2d at 167. Consequently, issues regarding the scope of § 11 protections have always been resolved by our courts through an analysis of the function of the jury in the same or analogous cases at common law. See, e.g., Ex parte LaFlore, 445 So.2d 932 (Ala.1983) (question of competency to stand trial was for the jury at common law; therefore, accused was guaranteed that right "by § 11 of the Constitution of 1901"); Kelley v. Mashburn, 286 Ala. 7, 236 So.2d 326 (1970) ("Ejectment was known to the common law"; therefore, § 11 preserves right to jury trial in such cases); Ex parte Thompson, 228 Ala. 113, 152 So. 229 (1933) (nonjury disbarment proceedings did not violate § 11 because, under English common law, power to disbar was inherent in the judiciary and juries were not employed in such cases); Thomas v. Bibb, 44 Ala. 721, 724 (1870) (right preserved by § 11 extends to "cases in which it was conferred by the common law, to suits which the common law recognized amongst its old and settled proceedings and suits"); Boring v. Williams, 17 Ala. 510, 517 (1850) ("summary remedy" against tax collector for allegedly delinquent collections did not violate right to jury trial where summary remedies in such cases were "the practice from a period long anterior to the adoption of the constitution"); see also Crowe v. State, 485 So.2d 351 at 363 (Ala.Crim.App.1984) ("advisory nature of jury's sentence verdict" did not violate § 11 because English common law juries did not determine criminal sentence and the purpose of § 11 is to "preserve the right to trial by jury as it existed in the English common law").
Moreover, this Court has long acknowledged the common law matrix that produced the guarantees contained in the Declaration of Rights and in § 11 in particular. In Mayor of Mobile v. Stonewall Ins. Co., 53 Ala. 570 (1875), this Court stated: "A state constitution is always interpreted in the light of the common law, and if it be not the first constitution, in the light of its predecessors." Id. at 577 (emphasis added). "The guaranties for the security of property and of personal liberty, found in the bill of rights, are borrowed chiefly from magna charta, and for their interpretation we look to the common law." Id. (emphasis added); see also State v. Alabama Power Co., 254 Ala. 327, 333, 48 So.2d 445, 449 (1950); Crowe v. State, 485 So.2d 351, 363 (Ala.Crim.App.1984) (section 11 "has remained virtually unchanged since the first state constitution was adopted in 1819" and it "draws its meaning from that early history"), rev'd on other grounds, 485 So.2d 373 (Ala.1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3284, 91 L.Ed.2d 573 (1986). To suppose that the framers of the Alabama Constitution of 1819 contemplated a role for Alabama juries entirely different from that envisioned by our common law ancestors defies ordinary logic.[7]

Proposition Three
If the first two propositions are to represent anything other than unrelated observations, *201 the reader must conclude that there is a third proposition supporting the principal opinion: that from the date of Alabama's statehoodDecember 14, 1819until Amendment 328 was proclaimed ratified on December 27, 1973, the essential factfinding function of the common law jury system was not protected by the organic law of this state. Attorneys on both sides of the bench will be amazed to discover that prior to 1973, according to the principal opinion, jury verdicts in Alabama could have been ignored with impunity and without fear of infringing on the right to a trial by jury.
Indeed, the respect for the sanctity of jury verdicts formed the basis for this Court's decision in Jawad v. Granade, 497 So.2d 471 (Ala.1986). Although Mr. Justice Houston states that Jawad was decided under Amendment 328 as well as § 11, a number of the cases upon which the holding in Jawad rested were decided long before the adoption of Amendment 328. See, e.g., Castleberry v. Morgan, 28 Ala.App. 70, 178 So. 823 (1938) (refusing to follow the Cobb standard); McEntyre v. First National Bank of Headland, 27 Ala.App. 311, 313, 171 So. 913, 914-15 (1937) ("in exercising the power [to set aside a jury verdict], the court should be careful not to infringe the right of trial by jury, and should bear in mind that it is their exclusive province to... find the facts").
By far, the most puzzling aspect of the principal opinion is its failure to demonstrate the relevance of any of these disjointed propositions to the ultimate conclusion. More specifically, the opinion fails to demonstrate how the second proviso in Amendment 328, § 6.11, which operates as a restriction on the power of the judiciary, restrains the power of the legislature. Indeed, Mr. Justice Houston's analysis appears occasionally to lead away from the conclusion that Amendment 328, § 6.11, restrains the legislature's power. If his analysis does so concede, and if, as the opinion states, § 11 traditionally protected only (1) impartiality, (2) duodecimality, and (3) unanimity, rather than the jury's traditional factfinding function, then how can it be said that § 6-11-3 violates the right to a trial by jury as guaranteed by § 11?
If the statute, under the analysis offered in the principal opinion, does violate § 11, it must be because the protection for the jury's factfinding function, which was "added" in Amendment 328, § 6.11, has somehow become "engrafted" on § 11. Nowhere does the opinion demonstrate how or when this engrafting took place. Its discussion of Amendment 328, therefore, becomes irrelevant and the conclusion of the opinion that § 6-11-3 violates the right to a trial by jury as guaranteed by § 11 is not based on identifiable principles of logic.
In my view, the rationale of the principal opinion is seriously flawed, because it fails to apply a "stand up" § 11 analysis to the challenged legislation. I would hold forthrightly that § 6-11-3 violates the right to a trial by jury as that right is, and has always been, guaranteed by § 11 of the Constitution of Alabama.
MADDOX, Justice (dissenting).
The majority concludes that "[i]t is apparent that the sentence, `The fact-finder shall not reduce any future damages to present value,' contained in § 6-11-3 and in § 6-11-5 does take away from the jury a factfinding function (when a jury is the factfinder) that was within the province of the jury at the time of the ratification of the Constitution of 1901."
In Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 18 So.2d 810 (1944), this Court set out the rule that guides courts when reviewing the constitutionality of an act of the legislature:
"At the outset reference may be made, as is often done, to the principles by which courts are guided when it is sought to strike down as violative of the constitution a legislative act. Uniformly, the courts recognize that this power is a delicate one, and to be used with great caution. It should be borne in mind, also, that legislative power is not derived either from the state or federal constitutions. These instruments are only limitations upon the power. Apart from limitations imposed by these fundamental *202 charters of government, the power of the legislature has no bounds and is as plenary as that of the British Parliament. It follows that, in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law. State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 186 So. 487, 121 A.L.R. 283.
"Another principle which is recognized with practical unanimity, and leading to the same end, is that the courts do not hold statutes invalid because they think there are elements therein which are violative of natural justice or in conflict with the court's notions of natural, social, or political rights of the citizen, not guaranteed by the constitution itself. Nor even if the courts think the act is harsh or in some degree unfair, and presents chances for abuse, or is of doubtful propriety. All of these questions of propriety, wisdom, necessity, utility, and expedience are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decide is one of power, not of expediency or wisdom. 11 Am.Jur. pp. 799-812; A.F. of L. v. Reilly, District Court of Colorado, 7 Labor Cases No. 61, 761."
246 Ala. at 9, 18 So.2d at 814-15. (Emphasis added.)
I cannot agree that § 11 of the Alabama Constitution, which states that the right to trial by jury shall remain inviolate, limits the power of the legislature to deal with future damages for lost wages by providing for the structuring of those damages.
I recognize that juries had been permitted to assess damages for lost wages prior to the adoption of the 1901 Constitution, and I recognize that the framers of our Constitution intended to preserve the right of trial by jury, but I can find no support for the proposition that the right to trial by jury that § 11 declares inviolate applies to anything other than the principles that there must be 12 persons on the jury, that the jury must be impartial, and that the verdict of the jury must be unanimous.
Future damages are at best somewhat speculative, and I cannot believe that the legislature, vested with plenary power, is limited by any provision of the Constitution to deal with the recovery of future damages as it has in the act under review; consequently, I must respectfully dissent.
NOTES
[1] The breakdown of the jury verdict was $300,000 for pain and suffering, mental anguish, permanent injury, disability, and disfigurement; $82,800 for lost past wages; $150,000 for punitive damages; and $289,800 for lost future wages.
[2] This Court has held that the legislature had the power to divest a lawyer of a right to trial by jury in a disbarment proceeding, despite the fact that when the Constitution of 1901 was ratified a jury trial was provided by statute in disbarment proceedings. Ex parte Thompson, 228 Ala. 113, 152 So. 229 (1933). This Court has held that the legislature had the power to provide for a jury of six persons in insanity inquisitions despite the existence of a statute providing for a jury of 12 persons in such hearings when the Constitution was ratified. Smith v. Smith, 254 Ala. 404, 48 So.2d 546 (1950).
[3] Judge H.H. Grooms, in The Origin and Development of Trial by Jury, 26 Ala. Law. 162, 170 (1965), wrote:

"There have been various reasons assigned as to why the jury is composed of twelve persons. Initially, it appears that twelve was the favourite number of judges constituting a court among the early Saxons and Scandinavians. Also, that was the usual number of compurgators. The number twelve likewise prevailed on the Continent.
"`In analogy, of late the jury is reduced to the number of twelve, like as the prophets were twelve, to foretell the truth; the apostles twelve, to preach the truth; the discoverers twelve, sent into Canaan, to seek and report the truth; and the stones twelve, that the heavenly Hierusalem is built on: and as the judges were twelve anciently to try and determine matters of law; and always, when there is any waging law, there must be twelve to swear in it; and also as for matters of state, there were formerly twelve councillors of state....' (Guide to English Juries, by a person of quality. 1682.)
"As we have seen, the jury system was in its inception nothing but the testimony of witnesses, and to require that the twelve should be unanimous was simply to fix the amount of evidence which the law deemed conclusive."
(Emphasis added.)
[4] At the time of the ratification of Amendment 328, §§ 11 and 36 had been interpreted as restricting the legislature only from varying "the constituent number [12]," providing "for other than an unanimous verdict, and introducing regulations leading away from impartiality." Baader v. State, supra; Jones, Trial by Juries in Alabama, supra; and Brown v. State, supra.

The proviso in § 6.11 of Amendment 328 added something: "that the right of trial by jury as at common law ... shall be preserved to the parties." (Emphasis added.)
Justice Stone, in Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 498, 51 S.Ct. 513, 514, 75 L.Ed. 1188 (1931), construing the Seventh Amendment to the United States Constitution ["In suits at common law ... the right of trial by jury shall be preserved ..."], wrote the following for a unanimous Court in regard to what was encompassed by the Seventh Amendment:
"[W]e are not now concerned with the form of the ancient rule. It is the Constitution which we are to interpret; and the Constitution is concerned, not with form, but with substance. All of vital significance in trial by jury is that issues of fact be submitted for determination with such instructions and guidance by the court as will afford opportunity for the consideration by the jury which was secured by the rules governing trials at common law.... Beyond this, the Seventh Amendment does not exact the retention of old forms of procedure.... It does not prohibit the introduction of new methods for ascertaining what facts are in issue...."
(Emphasis added.)
In Baltimore & Carolina Line v. Redman, 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935), the United States Supreme Court held that the preserved substance of the common law right of trial by jury, as distinguished from mere matters of form or procedure, retained
"the common law distinction between the province of the court and that of the jury, whereby, in the absence of express or implied consent to the contrary, issues of law are to be resolved by the court and issues of fact are to be determined by the jury under appropriate instructions by the court."
(Emphasis added.)
However, this broadening of the language of § 11 by § 6.11 of Amendment 328 appeared in the form of a proviso.
The appropriate office of a proviso is to restrain or modify the enacting clause. Touart v. American Cyanamid Co., 250 Ala. 551, 555, 35 So.2d 484, 486 (1948); Cooper v. State, 28 Ala. App. 422, 425, 187 So. 500, 502 (1939), cert. denied, 237 Ala. 533, 187 So. 503 (1939); 82 C.J.S. Statutes, § 381 at 883 (1953).
The Constitution is subject to the same general rules of construction as are other laws; Alabama State Docks Dep't v. Alabama Public Service Comm'n, 288 Ala. 716, 724, 265 So.2d 135, 143 (1972), "due regard being had to the broader objects and scope of the constitution as a charter of popular government." 16 Am.Jur.2d Constitutional Law, § 91, at 417 (1979).
The enacting clause (§ 6.11) is:
"The supreme court shall make and promulgate rules governing the administration of all courts and rules governing practice and procedure in all courts...."
Therefore, the proviso that expands the language of § 11 of the Constitution to include the wording of the Seventh Amendment to the United States Constitution restrains or modifies only this Court's rulemaking power, because the appropriate office of a proviso is to restrain or modify the enacting clause; a proviso does not enlarge the enacting clause or confer a power or right. 82 C.J.S. Statutes § 381(3) at 888.
In Jawad v. Granade, 497 So.2d 471 (Ala. 1986), we recognized that § 11 of the Constitution and § 6.11 of Amendment 328 (although it was not referred to specifically) restricted the judicial department of government from interfering with the factfinding function of a jury (the substance of a jury trial, Gasoline Products, supra). In doing so, we overruled a line of cases holding that decisions of trial courts granting new trials on the ground that the verdict is against the great weight or preponderance of the evidence "will not be reversed, unless the evidence plainly and palpably supports the [jury] verdict." We did this because we felt that this judicially adopted standard, which sprung from dicta in an 1891 case (Cobb v. Malone, 92 Ala. 630, 9 So. 738 (1891)), was not consistent with the constitutional right to trial by jury, which in 1986 encompassed not only § 11, but also, insofar as this Court is concerned, § 6.11 of Amendment 328 of the Constitution. In Jawad, 497 So.2d at 476-77, a unanimous Court wrote, "[T]here can never be good reasons for attempting to judicially abolish, curtail, or diminish the constitutional right to trial by jury." Jawad involved the factfinding function of a civil jury.
[5] A paraphrase of Liva Baker's summation of Justice Holmes' career in The Justice from Beacon Hill: The Life and Times of Oliver Holmes 634 (Harper Collins 1991): "[Justice Holmes] had no loyalties to any group, and he led no crusades to a constitutional holy land."
[6] In Kirk, this Court held that Act No. 168, 1943 Ala. Acts 156, which provided that the parties could unanimously agree to accept a verdict rendered by a jury consisting of less than 12 members, did not offend the Constitution. Kirk, 247 Ala. at 48, 22 So.2d at 434.
[7] If the framers of the Constitution did envision a role for Alabama juries comparable to that of common law juries, it was clearly beyond the power of this Court to remove the constitutional protections of that role by judicial interpretation. Section 11 prohibits the "state through the legislative, judicial, or executive department one or allfrom ever burdening, disturbing, qualifying, or tampering with this right to the prejudice of the people." Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974) (emphasis added). Clearly, the judiciary is subject to the same constitutional restraints as the legislative or the executive branch.